IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No. 20-cv-1341**

VICKEY NICKEL;

      Plaintiff,

v.

BONAVENTURE OF CASTLE ROCK LLC,
a Foreign Limited Liability Company d/b/a BONAVENTURE OF CASTLE ROCK;
MOUNTAIN WEST RETIREMENT CORPORATION,
a Foreign Corporation, d/b/a BONAVENTURE SENIOR LIVING

    Defendants.

---

## COMPLAINT AND JURY DEMAND WITH CERTIFICATE OF REVIEW

---

Plaintiff, by and through her attorneys, HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC, complain against defendants for wrongful death and request a trial by jury as follows:

## I.  INTRODUCTION

1.    Frances Lacy, the mother of Plaintiff Nickel and her brother Richard Lacy, was an 82-year-old assisted living resident at Bonaventure of Castle Rock, which typically had an overall census of around 80 such residents.

2.    On March 14, 2019 while eating her dinner, a hotdog, in the Bonaventure dining room, routinely serving 30 to 40 people, Frances Lacy began choking and suffocating.

3.    Ms. Lacy was inadequately supervised due to insufficient staffing and/or staff insufficiently trained in Heimlich and related maneuvers. The failed gestures that were made minutes after she suffered airway obstruction from the hotdog lodged in her throat were untimely

and negligently unskilled.

4. In essence, there was no one trained immediately available to properly perform the Heimlich related maneuvers or CPR on Ms. Lacy, and she was allowed to suffocate to death unattended by any skilled help for four or more minutes in the public dining room of an assisted living facility at dinner with people watching her die.

## II. <u>JURISDICTION AND VENUE</u>

5. The District of Colorado has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is a diversity of citizenship between the plaintiff and defendants. There is a complete diversity of citizenship between the plaintiff and the Oregon entity defendants pursuant to 28 U.S.C. § 1332(a).

6. Venue is proper in the District of Colorado because the acts and omissions giving rise to the claims set forth herein occurred within Colorado.

## III. <u>PARTIES</u>

7. At all times pertinent hereto, Vickey Nickel, was a resident of the State of Colorado and a citizen of the United States of America.

8. Defendant Bonaventure of Castle Rock, LLC, d/b/a Bonaventure of Castle Rock ("Bonaventure") is a licensed health care facility located at 1855 Low Meadow Blvd., Castle Rock, CO 80109. Defendant Bonaventure of Castle Rock LLC is, a foreign limited liability company, doing business within Douglas County, Colorado. It is an Oregon entity, with a principal office street address 3425 Boone Road SE, Salem, OR 97317. Its registered agent of service is located at 1900 W. Littleton Blvd., Littleton, CO 80120. This defendant is directly liable for the acts and omissions of its employees and agents, including the inadequate presence of sufficiently trained

staff as direct result of joint budgeting, staffing and training decisions by its administration and by its closely related agent management company, Defendant Mountain West Retirement Center. Both these companies were charged with administering, and/or operating and managing the care program at Bonaventure Castle Rock, including staffing schedules, policies and procedures creation, approval and review and staff training.

9.      Defendant Mountain West Retirement Center d/b/a Bonaventure Senior Living is a foreign corporation and the closely related management company for Bonaventure facilities including Bonaventure Castle Rock.

10.     Per publicly available CDPHE licensure and ownership related records, both defendants are owned solely by the same individual owner, Kathleen D. Hamilton, who is also the Chief Executive Officer/President of both defendants.

11.     Mountain West Retirement Center is an Oregon corporation, with a principal office street address of 3425 Boone Road SE, Salem, OR 97317. Its registered agent of service is located at 1900 W. Littleton Blvd., Littleton, CO 80120. This defendant is also co-responsible for the day to day management of the facility defendant including staffing, staff training and budgeting through its agents and employees, as detailed in a Management Services Agreement between the defendants on file with CDPHE and dated July 5, 2011. This agreement is incorporated herein by this reference.

12.     Mountain West Retirement Center defendant is paid 7% of the gross facility revenues for managing the facility which includes developing all care policies and protocols and providing "all management services and support necessary for the day-to-day operation of Facility."  These services and support specifically include staff scheduling and training, hiring,

supervision, and direction of the work of all personnel employed at the facility including nursing employees and supervisors. As manager, this defendant creates and the facility defendant reviews and approves "all operational policies and procedures" that are used in the facility including "program manuals and the provision of training programs for the Facility's management and employees."

13.     Defendants are jointly directly liable in tort for the complained of acts and omissions of their employees and agents described herein including the negligent, grossly negligent and recklessly inadequate presence of  sufficiently trained staff which were the direct and proximate result of both defendants joint decisions, actual and tacit agreements as co-managing defendants, charged with administering and/or managing the care program at Bonaventure Castle Rock.  These decisions include the herein at issue staffing, policies, procedures and staff training with respect to the personal care and safety needs of their elderly residents and the budgets related to such functions.

14.     The Bonaventure system involves at least 26 assisted living facilities in Oregon, Washington and Colorado which, on information and belief, are similarly organized into limited liability companies managed by the Defendant management company.

## IV.  STATEMENT OF FACTS

15.     Frances Lacy was still enjoying her life, and a very much-loved assisted living resident at Bonaventure of Castle Rock from or around November 2017 to her death.

16.     She was very well regarded by everyone, staff and residents alike, and her death was not then at all expected.

17.     On March 14, 2019, while sitting with facility friends, she was eating a hot dog that

was not julienned and which had its casing still on it.

18.    To the awareness of staff, as it was her habit, Frances Lacy, was only wearing half her dentures which made her at higher risk for choking when eating.

19.    She began choking on the hot dog she was served in the presence of the people eating with her and, to the immediate awareness of the staff working in the dining room, who were either untrained in Heimlich maneuvers and CPR, or who, if trained, failed to intervene.

20.    A late arriving administrator was apparently also untrained in the Heimlich maneuver and, when he was summoned by a resident, found Frances Lacy still alive with pulse and breathing, seated in her electric wheelchair.

21.    There was a basket on the back of Frances' wheelchair which made hard to get close enough to perform an effective Heimlich from behind her back and necessitated her removal therefrom.

22.    On information and belief, Administrator Barrantes has stated he was unable to even get his arms around Frances Lacy to perform a Heimlich given her wheelchair position and the basket.

23.    Ms. Lacy's wheelchair looked like this:

 

24.     Rather than getting help or himself taking her to the floor, Mr. Barrantes just left Frances in the chair untreated.

25.     Professor Heimlich has clearly demonstrated how to perform the maneuver on an unresponsive person laying on the floor in a teaching video which begins immediately after the ad: https://www.youtube.com/watch?v=mbho7AJOEyA.

26.     Frances Lacy also should have first had her upper-back slapped five times to see if that dislodged the hot dog in her throat but this effort negligently was not made or reported or charted by the involved staff members including Mr. Barrantes.

27.     If such back slapping had been performed without success, Frances should have then been put on the ground and the maneuver performed just below the bottom of her rib cage using the weight of the body, but this also did not occur.

28.     The negligent and reckless system in place by defendants led to a complete and fatal staff care breakdown and failure to treat Frances with appropriate maneuvers in this time-is-of-the-essence situation.

29.     Because of a reckless and negligent system, the staff of the facility were not properly or sufficiently trained or sufficiently available to perform these maneuvers which lead to a fatal delay for a number of minutes and the same were never started until paramedics came further minutes later after Frances was in cardiac arrest from suffocation.

30.     Also negligently/recklessly, having jointly decided to have insufficient trained staff available in such situations, thereby trusting residents' lives to luck instead, defendants also had no reliable system of communication and communication equipment to immediately help staff find and STAT access and summon any staff persons elsewhere in the building who were trained in the

needed maneuvers or if they have had any such system it was negligently/recklessly not deployed or kept current due to systemic poor staff training and supervision by defendants.

31.     Choking is a well-known common cause of death in long term facilities to the knowledge of all facilities and managers like these defendants with years of experience and at least 26 assisted living locations in Colorado, Oregon and Washington.

32.     Choking incidents also commonly occur in dining rooms during meals which is where Frances Lacy was when she died.

33.     As a proximate cause of defendants' joint or tacit agreement to tolerate insufficient staffing and negligent training, the involved staff during the incident were not prepared or trained or available to act and had to leave Frances Lacy to get other help.

34.     Indeed, after this choking incident was observed, defendants' staff ran around in their building like the proverbial chickens with their heads cut off looking, presumably, to no avail for a trained person.

35.     Because there was no working emergency system or sufficiently trained available staff for choking incidents then-present staff did not know what to do, could not find each other, did not know who to call or where any trained person or persons were.

36.     Defendants' workers and agents even apparently went to the building receptionist, who could not help or would not help. Finally, from Mr. Barrantes' statements to the police, a *resident* got him to come to the dining room.

37.     Mr. Barrantes, an untrained person who was unable to help, himself went to the dining room without locating anyone trained.

38.     Several minutes of critical time was thus negligently wasted while Frances Lacy's

airway was 100% occluded until Director Barrantes finally got there not knowing what to do or how to do it.

39.     Thus, a woman with a readily treatable condition was not ever timely or sufficiently cared for as she experienced a highly foreseeable choking incident in a long-term facility dining room.

40.     It is defendants' untenable position that as long as they have the theoretical capability of providing Heimlich care by one individual who is trained and present somewhere in the building at all times, even if that person is not available or locatable, they have discharged their staffing duties to ensure proper care in this case.

41.     Such a staffing plan and position is egregiously and recklessly negligent, falling far below the standard of care.

42.     Sufficient staffing requires that there be enough trained staff to timely meet the needs of choking residents.

43.     Assisted living facilities can be very large or very small. Defendants program is obviously too big for a single trained person to suffice to cover choking incidents.

44.     While one trained person working with just a few residents might suffice in a smaller program, one trained person who is not available and cannot even be communicated with STAT clearly does not suffice where, as here, many elderly persons are routinely being assembled in a dining room for meals.

45.     When such persons are being fed in a dining room, the standard of care requires that there be someone trained who is close enough to immediately perform emergency maneuvers while there is time to save lives.

46.     The standard of care requires that defendants must provide staff trained sufficient in number to help residents in these foreseeable choking situations. Sufficient can never be just one unavailable person in bigger facilities like this one. Rather, the standard of care requires defendants to have sufficient staff trained in the necessary airway obstruction interventions and CPR available to timely meet their residents' needs.

47.     Defendants' joint staffing and training decisions and agreements or tacit agreements to permit and to implement a system which permitted that there be circumstances of no available trained staff member at mealtimes to timely meet the urgent needs of residents in their dining room for airway protection, clearance, and CPR, was negligent, grossly negligent and recklessly insufficient.

48.     Defendants plan and decision to permit not having a single such person in the dining room, or readily accessible to immediately intervene in that location, was obviously recklessly and negligently insufficient staffing and training to meet the urgent needs of the residents in defendants' care.

49.     Training in the Heimlich maneuver and CPR is not expensive or time consuming.

50.     Defendants have long jointly consciously determined to adopt a derelict and insufficient approach to staffing, training and budgeting for staff who can perform these maneuvers, for reasons which appear to serve only the interests of entrepreneurial greed and recklessly reduce choking residents' chances for continued life to luck.

51.     In addition to the Heimlich maneuver, CPR also was not timely started by the facility or Mr. Barrantes while Frances was still alive.

52.     Paramedics were called and Mr. Barrantes told the police that while he "was on the

phone with 911with dispatch" they "advised him to lay her down on the floor and begin CPR."

53.    Mr. Barrantes also told the police that he performed the Heimlich maneuver and Frances "did spit out some food but then looked as if she passed out, but she still had a pulse."

54.    On information and belief, Mr. Barrantes' claim that the Heimlich maneuver having been performed is not true, and this top manager has since apparently stated that he was unable to even *attempt* a Heimlich because he could not get his arms around her.

55.    Being untrained as part of defendants' system, Mr. Barrantes did not put Frances on the floor, nor did he or other staff perform any CPR as they were instructed. This too was negligent, grossly negligent and reckless.

56.    Indeed, the paramedics confirmed that when they arrived Ms. Lacy was still in her wheelchair unresponsive at the dinner table in cardiac arrest.

57.     Thus, in his report, first responder Nolan Devine wrote that he arrived "to find 82-year-old female sitting in wheelchair unresponsive at the dinner table in cardiac arrest."  It was minutes between when 911 was called and caregivers arrived.

58.    Dr. Dawn Holmes, a forensic pathologist, performed an autopsy and determined the cause of death to be "asphyxia due to aspiration of a food bolus".

59.    Dr. Holmes further found that Ms. Lacy's "oropharynx/larynx [was filled] with food bolus occluding near 100% of the airway lumen."

60.    Ms. Lacy's death was classified as an "accident" and not natural.  Accidents include malpractice and just therapeutic misadventures like this one due to defendants' intolerable joint system.

61.    Hot dogs have long been recognized to be a top cause of food related choking

incidents in both children and the elderly.

62.     It has also long been known that absence of proper teeth can cause older people to chew improperly and/or misjudge whether food is fully chewed before swallowing.

63.     This danger was known or should have been known to defendants' staff and agents, who knew Frances did not wear both sets of her dentures but nonetheless did not adequately supervise or staff the dining room with a trained person during this hotdog eating event.

64.     In sum, Frances had a fatal choking event that was not timely or properly attended to that was very treatable.

65.     The applicable state assisted living regulations also inform defendants' common law duties of due care mandate that defendants have sufficient trained to meet the needs of residents to proper quality care and treatment with regard to this type of situation.

66.     Thus  in 6-CCR-1011 Chapter 7, Section 8.5 – 8.7  CDPHE mandates that: "**The assisted living residence shall ensure that it has *sufficient staff <u>members</u>* ** who are currently certified in first aid and cardiopulmonary resuscitation" with,  obviously for smaller facilities,  at "least one staff member onsite at all times who has current certification in first aid from a nationally recognized organization" . . . in both "cardiopulmonary resuscitation (CPR) and obstructed airway techniques  from  a  nationally  recognized  organization."   (Emphases  supplied).  Defendants breached this provision.

67.     Section 8.4 of the ALF regulations states that: "**Staff shall be *sufficient in number <u>to help residents needing</u>* ** or potentially needing **<u>assistance</u>**, considering individual needs such as **the risk of accident, hazards or other challenges**."   Emphases supplied. Defendants breached this provision.

68.     Section 8.8 provides that: "Each assisted living residence shall place in a visible location a list of all staff who have current certification in first aid or CPR **so the information is readily available to staff at all times**.  The list shall be kept up to date and indicate by staff person whether the certification is in first aid or CPR or both." Emphasis added. Defendants breached this provision.

69.     The standard of care was to have sufficient trained staff to meet the needs of all residents which was totally breached here as there was no timely available staff in the dining room area who were trained in proper Heimlich maneuvers to assist Ms. Lacy for several minutes.

70.     As a direct and proximate result, she suffocated to death, untreated in the dining room where such choking evens most commonly occur.  Though she was a DNR, Frances was well known to want to be alive and to have interventions to clear her throat and save her life from this type of readily treatable situation.

71.     Here is a picture of Ms. Lacy with her children:



72.     As a result, plaintiff seeks damages, losses and injuries on behalf of herself and her

brother Richard Lacy as provided by the relevant wrongful death and distribution statutes governing recovery in an amount to be determined by the jury at trial to fairly compensate them for this wrongful death. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other economic and non-economic damages including final illness care as allowed under the Colorado Wrongful Death Act and other laws.

73.    Plaintiff is entitled to general and compensatory damages for the pain and suffering and emotional distress she and her brother have experienced, and to special damages for past and future medical, funeral, and health care related total charges, all in amounts to be proven at trial.

## V.  CLAIM FOR RELIEF
### FIRST CLAIM FOR RELIEF: WRONGFUL DEATH

74.    Plaintiff hereby incorporates all the preceding paragraphs, as if each were fully set forth herein.

75.    At all times relevant hereto, Frances Lacy was a resident under the care and treatment of the Defendants' staff.

76.    At all times relevant hereto, defendants, as owners and managers, and their staff including managers had nursing-patient relationships, or other therapeutic care relationships with Ms. Lacy and through her with plaintiff and her brother.

77.    These jointly acting defendants are directly liable for the negligent and reckless or purposeful acts and omissions by their agents and/or employees and or contractors, including involved management team members because by joint policy, procedures and budgeting decisions they permitted and planned this situation of negligently/recklessly untrained and insufficient staffing with respect to airway obstruction and CPR to persistently exist at the facility.

78.    Defendants are jointly and severally liable for the complained of foreseeable

tortious conduct of staff at the facility who were at all times employees or agents of these defendants under 13-21-111.5 (4), C.R.S., in that these negligent and reckless defendants consciously and deliberately decided or had a tacit understanding for the purpose of saving money that they would pursue and facilitate a common plan or design which permitted the tortious acts which very foreseeably occurred here from their reckless joint training and staffing decisions which caused this situation in which no staff were available to skillfully attending to Frances Lacy during a crisis. This direct liability causing joint system caused a grossly substandard response by all the involved staff in this incident.

79.     As set forth in the statement of facts, the involved persons were employees and agents of defendants, acting within the scope of their employment, variously committed negligent and/or reckless acts and omissions with respect to not attending to Frances Lacy in a crisis.

80.     Defendants as owners, operators and managers of Bonaventure at Castle Rock and their staff owed plaintiff and her brother and their decedent, Frances Lacy, duties of due care which included but are by no means limited to:

      A.     A duty to train, sufficiently staff and budget to have and/or implement standing orders, policies, procedures and care plans for situations of airway obstruction and CPR including choking incidents;

      B.     A duty to protect residents like Ms. Lacy from neglect;

      C.     A duty to properly chart;

      D.     A duty to provide reasonable and timely care and treatment to Frances Lacy during a choking emergency;

      E.     A duty to exercise reasonable care in training, staffing sufficiency and supervision of staff;

      F.     A duty to provide proper and sufficiently trained staff who were readily available to intervene with airway obstruction and provide CPR if necessary at

or right around facility dining rooms during meals for residents to timely and safely address choking situations;

G.     A duty to have proper and sufficient staffing  and communication protocols and equipment to immediately access trained staff to timely intervene in choking crises like this one;

H.     A duty to ensure that trained staff  timely intervene to perform Heimlich and related back slapping, first aid and CPR procedures for choking persons who are experiencing airway obstruction from food during meals;

I.   A duty by staff to follow the instructions of paramedics responding to this choking calamity.

81.     Defendants' breached these managerial, ownership and staff duties of due care to plaintiff, her brother and the deceased, by the negligent and reckless acts and omissions set forth herein, including by jointly negligently and recklessly:

A.     Failing to train, sufficiently staff and budget to have and/or implement standing orders, policies, procedures and care plans for situations of airway obstruction  and CPR including choking incidents;

B.     Failing to protect Frances Lacy from fatal neglect;

C.     Failing to properly chart;

D.     Failing to provide reasonable and timely care and treatment to Frances Lacy during a choking emergency;

E.     Failing to exercise reasonable care in the training, staffing sufficiency and supervision of staff;

F.     Failing as a system to organize to provide proper and sufficiently trained staff who were readily available to intervene with airway obstruction and, if necessary, to provide CPR at or right around facility meals in the dining room to timely and safely address choking situations;

G.     Failing to have proper and sufficient staffing  and communication protocols and equipment to immediately access trained staff to timely intervene in choking crises like this one;

H.    Failing to ensure that trained staff timely intervene to perform Heimlich and related back slapping, first aid and CPR procedures for choking persons who are experiencing airway obstruction from food during meals;

I.    Failing to train staff that they must follow the instructions of paramedics responding to this choking calamity.

82.    Defendants' breaches of their duties of due care proximately caused injury and death to Frances Lacy.

83.    Defendants' duties of due care and the national standards of care breached by the acts and omissions complained of above are informed by applicable state regulations, some of which are quoted herein.

84.    These direct joint negligent, grossly negligent and reckless acts by defendants lead to this complete care breakdown fiasco involving insufficiently trained employees and agents and were a substantial and significant contributing proximate cause in the preventable and untimely death of Frances Lacy.

85.    Had defendants, not committed the negligent/grossly negligent and reckless acts and omissions outlined herein, Frances Lacy would not have died how or when she did.  She was not expected to die at that time.

86.    As a result, plaintiff seeks damages, losses and injuries for herself and her brother in an amount to be determined by the jury at trial to fairly compensate them for this wrongful death. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other economic and non-economic damages including final illness care as allowed under the Colorado Wrongful Death Act and other laws.

87.    Plaintiff seeks general and compensatory damages for such pain and suffering and emotional distress as they have experienced, and is also entitled to any special damages for past

and future medical, funeral, and health care related total charges, all in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff prays that the Court award against defendants:

A.     All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, and all other non-economic and economic damages including funeral and health care related expenses available under the law;

B.     Punitive damages should suitable amendment be granted after substantial discovery as allowed by Colorado law and in an amount to be determined at trial;

C.     Pre- and post-judgment interest as appropriate;

D.     Costs as provided by law; and

E.     Any further relief at law or equity that this Court deems just and proper.

## PLAINTIFF RESPECTFULLY REQUEST TRIAL BY JURY.

Respectfully submitted this 12th day of May, 2020.

*/s/ John R. Holland*
John R. Holland
Rachel Kennedy
Anna Holland Edwards
Holland, Holland Edwards & Grossman, LLC
1437 High Street
Denver, CO 80218
john@hheglaw.com
Phone:  (303) 860-1331
Fax:  (303) 832-6506
*Attorneys for Plaintiff*

**<u>CERTIFICATE OF REVIEW</u>**

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has expertise in the areas of alleged negligence and recklessness and that this professional has reviewed the known facts, including such records, documents, and other materials as they have found to be relevant to the complaint allegations of negligent acts and omissions and has concluded that the filing of this claim does not lack substantial justification and in fact is substantially meritorious within the meaning of C.R.S. § 13-20-602 with violations of the standards of care involved.

/s/ *John R. Holland*
John R. Holland